**Opinion issued July 9, 2019**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

## NOS. 01-18-00694-CR & 01-18-00695-CR

_____

**OSBIEL GOMEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 183rd District Court**
**Harris County, Texas**
**Trial Court Case Nos. 1565507 & 1565508**

---

## MEMORANDUM OPINION

A jury convicted appellant Osbiel Gomez of possession with intent to deliver at least 400 grams of methamphetamine and possession with intent to deliver between 200 and 400 grams of heroin. The jury assessed his punishment in both cases at twenty-five years' incarceration, with the sentences to run concurrently.

Gomez argues on appeal that the evidence supporting both convictions is insufficient to prove that he knowingly possessed methamphetamine and heroin by exercising care, custody, or control over the drugs. Finding no reversible error, we affirm the trial court's judgment.

## Background

In September 2017, Houston Police Department (HPD) Narcotics Officers Marco Valles and Robert Bradley received a tip from a confidential informant that someone was selling drugs from a second-floor apartment located at 8751 Broadway Street in Houston. The confidential informant told Valles that the suspected trafficker who lived in the apartment was named Osbiel Gomez.

After speaking with the informant, Officer Valles conducted surveillance on the apartment at random times during the day from September 11, 2017 to September 21, 2017. During his surveillance, Valles observed a male who he recognized as Gomez entering and exiting the apartment multiple times. According to Valles, Gomez's primary vehicle, a white truck, was parked in the parking lot unless Gomez went somewhere. Valles observed Gomez leaving in the truck and returning a short time later; he did not appear to be going to work.

Valles often saw Gomez come and go from the apartment with Lisa Le and two young children. Valles testified that Gomez, Le, and the two children appeared

to be a family unit. Le, whose name is on the apartment's lease, was also referred to by the officers as Gomez's wife.

On three occasions, Valles observed Gomez leave the apartment to meet up with someone who had just driven into the apartment's parking lot. Gomez would get into the passenger side of their vehicle for very short periods of time before returning to the apartment. Valles, who could not see what was happening inside the vehicles, agreed that such behavior provided extra information that possible illegal activity was occurring in the apartment. Officer Bradley testified that he had seen Gomez on September 21, 2017, the last day of surveillance. When asked what he saw Gomez doing, Bradley replied, "[t]hat was the day we did the—I think that was the day of the controlled buy."

Valles obtained a search warrant for the apartment on September 22, 2017, the day after the controlled buy. The following day, Valles and Bradley went to the apartment complex and waited for the right time to execute the warrant. Gomez's truck was parked in the parking lot when they arrived. Gomez, who exited the apartment with Le and the children around midday, opened the truck's door for the family. Valles testified that the apartment's door had been left open and that Gomez, who had a key to the apartment at that time, "walked back up and locked it and came back in the truck."

When Gomez and the family returned to the apartment complex a few hours later, uniformed officers stopped Gomez in the parking lot and arrested him for municipal warrants. Le was also asked to step out of the vehicle.[1] HPD K-9 Officer Peter Esbrandt and his drug dog searched Gomez's truck, but the dog did not alert to the truck and the dog did not perform a sniff of Gomez's person.

Although Le denied having a key to the apartment, the officers located the key in a woman's Victoria's Secret wallet found near the passenger seat in appellant's truck where Le had been sitting. The officers did not find an apartment key on Gomez's key ring. Officer Bradley, however, testified that it is not uncommon for a couple to leave their house when only one person has a key.

After obtaining the key from the wallet, Officer Esbrandt and the drug dog searched the empty apartment. According to Officer Esbrandt, the drug dog alerted on "a giant pile of clothes" on the floor of the master bedroom's closet and a cabinet underneath the sink in the master bathroom. Officer Esbrandt reported the results to the officers who then searched the areas identified by the drug dog. Officer Esbrandt also assisted with the ensuing search.

---

[1]     Lisa Le was also arrested and charged with possession with intent to deliver controlled substances.

During the search, officers found 368.86 grams of methamphetamine[2] in Tupperware container on the floor of the master bedroom closet. Officer Bradley recalled that the Tupperware container was not hidden or under any item of clothing and that there were some adult tennis shoes next to the container, but he could not tell if the shoes were for men or women. He also could not recall what kind of clothing was on the bed in the master bedroom. Esbrandt, who had testified that the location where the drug dog alerted "had a big pile of clothes on top of it," did not recall anything about the clothing he saw other than the fact that there was a large pile of them.

Officer Valles testified that the master bedroom appeared to be shared by Le and Gomez. He also testified that a combination of men's and women's, along with children's clothing and shoes, was around the Tupperware container, and that clothing for men, women, and children was scattered "all throughout" the bedroom. Valles, however, did not document specific items of male clothing in his report and he agreed that specific items of male clothing were not discernible from the scene photographs.

---

[2] The quantity of methamphetamine found in the apartment is based on the amount of the drug admitted at trial, not the weight of the drug calculated at the scene, which includes the weight of the container.

The officers also found 240.97 grams of heroin[3] and 101.1 grams of Xanax[4] in a bag inside the master bathroom cabinet, "[u]nder the sink and tucked away behind a bunch of dirty clothes." Bradley did not recall seeing any men's toiletries in the bathroom.

The officers also found a clear baggy of 54.5 grams of methamphetamine and $4,990 in cash in a dresser in the master bedroom. The methamphetamine was found in a drawer with clothing that appeared to be for women and children. The cash was found in a drawer containing child and adult clothing; Valles could not tell from the scene photograph if the adult clothing was for men or women. Although the drug dog did not alert to the drugs or money in the dresser initially, the dog later alerted to the presence of narcotics odor on the money. Valles testified that the amount of cash recovered at the scene was significant because drug dealers typically have a large amount of cash in their homes, transactions are usually done on a cash-basis and, after observing Gomez for over a week, he did not believe that Gomez had another source of income apart from possible drug sales.

---

[3]     The quantity of heroin found in the apartment is based on the amount of the drug admitted at trial, not the weight of the drug calculated at the scene, which includes the weight of the container.

[4]     Unlike the heroin and methamphetamine, the Xanax was not admitted into evidence. Therefore, we will rely on the officer's testimony regarding the amount of the drug found in the apartment.

Two digital scales were found on a shelf in a living-room or dining area and Ziploc bags were found in the master bathroom. Bradley and Valles testified that drug traffickers use scales to weigh individual amounts of drugs. Bradley agreed that Ziploc bags are commonly found where someone is selling drugs; and Valles testified that Ziploc bags are typically used for packaging individual amounts of drugs.

Officer Bradley noted that the Tupperware container they found in the closest contained a "significant amount of crystal methamphetamine." When asked if he would characterize the amount of methamphetamine as a large amount, Officer Bradley testified, "[I]t's not a user's amount and it's a significant amount." Officer Valles also testified that the amounts of methamphetamine and heroin found in the apartment were "not for personal use. They're normally for sale at those amounts."

Documents connected to Gomez were also found at the apartment, including: (1) a Houston Municipal Courts receipt, (2) an employment-verification letter, and (3) a binder with his name on it. The records, however, were dated over a year and a half before the search, and none of them listed an address for Gomez.

The white truck Gomez drove was registered to his father in Crosby, Texas and the address listed for Gomez on the police report was his parents' address in Crosby. The State did not present any evidence that Gomez was listed on the apartment's lease or that he paid utilities for the apartment. Valles testified, however,

that he would not have been surprised if Gomez was not on the lease because drug traffickers use vehicles and homes listed in other people's names to prevent law enforcement from finding them or identifying them.

No drug paraphernalia was found in the apartment and neither Gomez nor Le displayed any symptoms of methamphetamine or heroin use. No fingerprint or DNA evidence was collected.

## Sufficiency of the Evidence

In his sole issue on appeal, Gomez argues that the evidence supporting his convictions is insufficient to prove that he knowingly possessed methamphetamine and heroin by exercising care, custody, or control over the drugs.

### A. Standard of Review

In a review for legal sufficiency, we view all of the evidence in the light most favorable to the verdict and determine whether a rational factfinder could have found the essential elements of the crime beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (relying on *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). We must not re-evaluate the weight or credibility of the testimony; rather, we defer to the jury's resolution of conflicts in the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). When the record supports conflicting inferences, the reviewing court is to presume that the fact-finder resolved the conflicts in favor of the prosecution and defer to that determination. *Clayton v.*

8

*State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Appellate courts cannot use a divide-and-conquer strategy in a sufficiency analysis, because that approach does not consider the cumulative force of all the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

The court considers both properly and improperly admitted evidence. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). Each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Blackman v. State*, 350 S.W.3d 588, 595 (Tex. Crim. App. 2011). The prosecution has no affirmative duty to rule out every hypothesis except that of guilt. *Id.* Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient. *Jenkins*, 493 S.W.3d at 599. While inferences based on mere speculation are insufficient to support a conviction, the trier of fact is the exclusive judge of the credibility and weight of the evidence and is permitted to draw any reasonable inference from the evidence so long as it is supported by the record. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015).

**B.    Applicable Law**

Gomez was charged with (1) possession with intent to deliver at least 400 grams of methamphetamine, and (2) possession with intent to deliver between 200

and 400 grams of heroin. TEX. HEALTH & SAFETY CODE §§ 481.102(2), (6); 481.112(a), (e), (f). "Possession" means actual care, custody, control, or management. TEX. PENAL CODE § 1.07(a)(39).

To prove unlawful possession of a controlled substance, the State must prove beyond a reasonable doubt that the defendant exercised control, custody, management, or care over the substance, and that the defendant knew the substance was contraband. *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005); *see* TEX. HEALTH & SAFETY CODE § 481.115(a) ("[A] person commits an offense if the person knowingly or intentionally possesses a controlled substance listed in Penalty Group 1 . . . .").[5] Possession of the contraband does not have to be exclusive. *Wiley v. State*, 388 S.W.3d 807, 813 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd).

When the accused is not in exclusive possession of the place where the contraband is found, the State must establish that the defendant's connection with the drugs was more than fortuitous, a requirement known as the "affirmative links" rule. *Evans v. State*, 202 S.W.3d 158, 161 (Tex. Crim. App. 2006); *Poindexter*, 153 S.W.3d at 405–06; *Wiley*, 388 S.W.3d at 813. This rule is designed to protect an innocent bystander from conviction based solely upon his mere presence in the

---

[5] Gomez was only charged with "knowingly" possessing methamphetamine and heroin.

vicinity of someone else's drugs. *Evans*, 202 S.W.3d at 161–62. It recognizes that a defendant who is not in exclusive possession of the place where the controlled substance was found may not have knowledge of and control over the drugs; in such cases, additional independent facts and circumstances beyond mere presence must link him to the drugs. *Tate v. State*, 500 S.W.3d 410, 413–14 (Tex. Crim. App. 2016) (citing *Poindexter*, 153 S.W.3d at 406, and *Deshong v. State*, 625 S.W.2d 327, 329 (Tex. Crim. App. 1981)).

The Texas Court of Criminal Appeals has instructed that direct or circumstantial evidence of one or more of the following links may provide the logical force that demonstrates possession and not mere presence:

> (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt.

*Evans*, 202 S.W.3d at 162 n.12; *Burrell v. State*, 445 S.W.3d 761, 765 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). The State is not required to prove all of these links. *See Evans*, 202 S.W.3d at 162; *James v. State*, 264 S.W.3d 215, 219 (Tex.

11

App.—Houston [1st Dist.] 2008, pet. ref'd). Further, the absence of some links is not evidence of innocence that weighs against those links that are present. *Id.* (citing *Hernandez v. State*, 538 S.W.2d 127, 131 (Tex. Crim. App. 1976)). It is not the number of links that is dispositive, but the cumulative weight of the evidence. *Evans*, 202 S.W.3d at 162; *James*, 264 S.W.3d at 219. Though this framework guides an appellate court in analyzing the evidence, the dispositive inquiry remains the one set forth in *Jackson*—whether the combined and cumulative force of the evidence and any permissible inferences permit a jury to rationally find the defendant guilty of the offense beyond a reasonable doubt. *Tate*, 500 S.W.3d at 414.

**C.     Analysis**

It is undisputed that Gomez was not in exclusive possession of the apartment where the officers found the methamphetamine and heroin; thus, the State had to present evidence linking Gomez to the methamphetamine and heroin and prove beyond a reasonable doubt that Gomez's connection to the narcotics "was more than fortuitous." *See Evans*, 202 S.W.3d at 161. We therefore examine the evidence to determine whether the State presented sufficient evidence such that a rational jury could have found beyond a reasonable doubt that Gomez possessed—that is, exercised actual care, custody, control, or management over—the methamphetamine and heroin. *See Tate*, 500 S.W.3d at 414 (noting that, in "affirmative links" cases,

12

court's ultimate inquiry remains whether evidence was sufficient under *Jackson v. Virginia* standard).

Although there was no evidence that Gomez's name was on the lease or that he paid utilities for the apartment, the State presented sufficient evidence from which the jury could have reasonably inferred that Gomez lived in the apartment with Le and the children or otherwise had a right to possess the apartment. *See Evans*, 202 S.W.3d at 162 n.12 (noting that defendant's right to possess place where contraband is found is affirmative link connecting defendant to contraband); *see generally Burrell*, 445 S.W.3d at 765 (noting that evidence showed defendant lived in and had right to possess apartment where drugs were found, even though he was not named lessee).

Specifically, the State presented evidence that Gomez was seen multiple times entering and leaving the apartment during the ten-day surveillance period, and his primary vehicle was seen in the apartment parking lot unless he went somewhere. *See Hutchison v. State*, 424 S.W.3d 164, 171–72 (Tex. App.—Texarkana 2014, no pet.) (noting as one strong link to contraband that, before search, police observed defendant leave house, return, enter without knocking, and leave again). Gomez was also seen several times coming and going from the apartment with Le and the children, who undisputedly lived in the apartment and were described as Gomez's family.

Although he did not have a key to the apartment on his key ring, Gomez was the last person seen leaving the apartment before the search warrant was executed, Officer Valles saw Gomez use a key to lock the apartment door, and there was no evidence that anyone else was inside the apartment or entered it after Gomez locked the door and left. *See Haggerty v. State*, 429 S.W.3d 1, 6–7 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (although not present when search occurred, defendant was last person to leave home before search, officers saw him use key to lock door, no one else was seen entering home in his absence, and no one was inside when search was conducted, so home was in same condition when officers found it as when defendant left it).

The State also presented evidence that documents belonging to Gomez were found in the apartment, along with items of male clothing. Although none of the officers were able to identify specific items of male clothing from the photographs, the jury was entitled to credit Valles's testimony that he found male clothing "all throughout" the master bedroom and near the Tupperware container in the master closet. *See Ramsey*, 473 S.W.3d at 809. The jury could have reasonably inferred from this evidence that the clothing belonged to Gomez, given that there was no evidence indicating that another man lived in or stayed at the apartment. *See Evans*, 202 S.W.3d at 165.

The State also presented evidence that Gomez was present during the search. *See Evans*, 202 S.W.3d at 162 n.12 (noting that presence at scene of search is affirmative link connecting defendant to contraband). Specifically, Gomez had just returned to the apartment complex with his family and was being detained in the parking lot when the officers searched his truck and the apartment. *See generally Lipscomb v. State*, 526 S.W.3d 646, 653 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd); *Williams v. State*, Nos. 01-09-00257-CR, 01-09-00258-CR, 2010 WL 2991097, at *5 (Tex. App.—Houston [1st Dist.] July 29, 2010, pet. ref'd) (mem. op., not designated for publication) (stating that defendant, who was in vehicle backing out of driveway when police arrived, was present during house search).

The officers also found large amounts of methamphetamine and heroin in the apartment, along with other drugs and drug-selling paraphernalia—namely, two digital scales, Ziploc bags, and 101.1 grams of Xanax tablets. *See Evans*, 202 S.W.3d at 162 n.12 (noting that presence of other contraband or drug paraphernalia is affirmative link); *see also Roberson v. State*, 80 S.W.3d 730, 740 (Tex. App.— Houston [1st Dist.] 2002, pet. ref'd) (stating amount of contraband can be affirmative link and this factor can reasonably be expected to increase as amount of drugs increases).

The officers also found $4,990 in cash inside a dresser drawer in the master bedroom. The State presented evidence that the cash smelled of narcotics, drug

15

dealers often have large amounts of cash such as this in their homes, Gomez did not appear to have a job, and Officer Valles did not believe that Gomez had another source of income apart from possible drug sales.

Officer Valles, who had learned from a confidential informant that Gomez was selling drugs from the apartment, saw Gomez on three occasions, leaving the apartment and getting into vehicles in the parking lot for a short period of time before going back into the apartment. Such evidence is consistent with illegal drug activity originating out of the apartment. *See e.g.*, *Hurst v. State*, No. 14-15-00539-CR, 2016 WL 3703101, at \*4 (Tex. App.—Houston [14th Dist.] July 12, 2016, pet. ref'd) (mem. op., not designated for publication) (officer testified that defendant's leaving apartment, approaching passenger side of car, briefly talking to driver, and returning to apartment, was behavior consistent with that of drug dealer). Officer Bradley also testified that he saw Gomez two days before the warrant was executed, and, when asked what he saw Gomez doing, Bradley stated that he believed that was the day of the controlled buy. The jury could have reasonably inferred from this evidence that Gomez was involved in a controlled drug buy and had been selling drugs from the apartment, and therefore he was not an "innocent bystander" whose proximity to the drugs in the apartment was merely fortuitous. *See generally Evans*, 202 S.W.3d at 161–62.

The location of the contraband further supports the inference that Gomez had care, custody, control, or management of the methamphetamine and heroin. All of the contraband was found in an enclosed place, namely, a private residence occupied by Gomez. The Ziploc bags and scales were in plain view in the master bathroom and living room, respectively. Although there was conflicting testimony about whether the Tupperware containing most of the methamphetamine was in plain view in the master bedroom's closet or covered in clothing, we presume that the jury resolved this conflict in favor of the prosecution and we defer to that determination when there is support in the record. *Clayton*, 235 S.W.3d at 778.

It is undisputed that the rest of the narcotics found in the apartment were hidden or secreted, and therefore, the State had to address whether Gomez "knew of the existence of the secreted place and its contents." *Allen v. State*, 249 S.W.3d 680, 694 (Tex. App.—Austin 2008, no pet.). The rest of the methamphetamine was found in a dresser drawer in the master bedroom and the heroin was found in a bag that was hidden behind a pile of dirty clothing and placed in a cabinet underneath the sink in the master bathroom. These items were hidden in unlocked areas that would have been readily accessible by Gomez, who shared the master bedroom with Le and had a right to possession of the apartment. *See Evans*, 202 S.W.3d at 162 n.12 (listing "the defendant's proximity to and the accessibility of the narcotic" as link to be considered). Furthermore, the jury could reasonably infer that Gomez knew about

17

the methamphetamine and heroin in the master bedroom and bathroom from the evidence in this case, including the significant quantities of the hidden narcotics, the large amount of cash found in the master bedroom, Officer Valles's testimony that he had seen Gomez engaging in activity indicative of someone participating in an illegal drug transaction and that Gomez did not have an identifiable source of income other than possible drug dealing, and the evidence indicating that Gomez participated in a controlled drug buy two days before the search. *See Allen*, 249 S.W.3d at 694 ("The State must link the accused to the contraband in such a manner that a reasonable inference arises that the accused knew of its existence and its whereabouts and that the object possessed was contraband.").

Gomez argues on appeal that there is no evidence of other specific affirmative links. For example, there is no evidence that Gomez was under the influence of narcotics when he was arrested or that he made any furtive gestures or incriminating statements at that time. There is also no evidence that Gomez attempted to flee. The number of links, however, is not dispositive and the "absence of various affirmative links does not constitute evidence of innocence to be weighed against the affirmative links present." *Jones v. State*, 466 S.W.3d 252, 260 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (quoting *James v. State*, 264 S.W.3d 215, 219 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd)).

The logical force of the direct and circumstantial evidence present in this case, coupled with reasonable inferences from such evidence, is sufficient to establish, beyond a reasonable doubt, that Gomez exercised actual care, custody, control, or management of the heroin and methamphetamine found in the apartment. *See Evans*, 202 S.W.3d at 166.

Viewing all the evidence in the light most favorable to the verdict, we conclude that a rational fact finder could have found beyond a reasonable doubt that Gomez knowingly possessed the methamphetamine and heroin found in the apartment. *See Gear*, 340 S.W.3d at 746.

We overrule Gomez's sole issue.

## Conclusion

We affirm the trial court's judgment.

Russell Lloyd
Justice

Panel consists of Justices Lloyd, Kelly, and Hightower.

Do Not Publish. TEX. R. APP. P. 47.2(b).